### ANN ARBOR R. CO. v. FELLOWS et al.

(District Court, E. D. Michigan, S. D. June 5, 1915. On the Merits, March 1, 1916.)

1. CARRIERS ⊜⟶18(6)—STATUTE FIXING RATES—SUIT TO ENJOIN ENFORCEMENT —PRELIMINARY INJUNCTION.

A federal court will not, at the suit of a railroad company, grant a preliminary injunction suspending the enforcement of a presumptively constitutional state statute fixing passenger rates, where the statute has been in force for a number of years and acquiesced in by complainant, and it appears that the suit can be tried on its merits within a very short time.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. ⊜⟶18(6).]

2. CONSTITUTIONAL LAW ⊜⟶70(3)—JUDICIAL POWER—STATUTE FIXING RATES.

The question whether a state statute fixing railroad rates is confiscatory as applied to a particular road is mainly one of fact, and in a doubtful case a court which has no power to fix or revise rates may not substitute its judgment for that of the Legislature, in which such power is vested.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 131; Dec. Dig. ⊜⟶70(3).]

3. CARRIERS ⊜⟶12(5)—STATUTORY REGULATION—CONFISCATORY RATES.

Precisely what is the just compensation which a railroad company is entitled to earn by the use of its property is seldom easy to determine, but rates which with economical and efficient management will yield a return equal to that received in other business ventures of similar character and attended with like risks can never be held confiscatory, and unless under exceptional circumstances a court is not justified in declaring invalid an enactment which permits net earnings equal to or not materially less than the interest allowed by statute in the absence of specific contract.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 11, 15–20; Dec. Dig. ⊜⟶12(5).]

4. CARRIERS ⊜⟶12(5)—STATUTORY REGULATION—CONFISCATORY RATES.

The value of the property and the revenues and expenses of a railroad company being ascertained and apportioned, and upon a finding of its net earnings on the property devoted to intrastate business, which from its passenger business approximates 6 per cent. per annum and from its freight business a higher per cent., the Michigan two-cent passenger fare law (Pub. Acts 1907, No. 54) and certain freight rates established by the Michigan Railroad Commission, under the operation of which such earnings were made, *held* not confiscatory.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 11, 15–20; Dec. Dig. ⊜⟶12(5).]

---

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. CARRIERS ☞12(5)—SUIT TO ENJOIN ENFORCEMENT OF STATUTORY RATES—VALUATION OF PROPERTY.**

The method of ascertaining the present value of railroad property by taking the cost of reproduction less accumulative depreciation, while perhaps the best general method yet devised, cannot be applied in all cases and under all conditions.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 11, 15–20; Dec. Dig. ☞12(5).]

**6. WORDS AND PHRASES—"LOCOMOTIVE TON MILE RATIO."**

The phrase "locomotive ton mile ratio" means that the ton weight of a locomotive, without its tender, multiplied by the number of miles traveled, correctly represents the measure of the use of the roadbed and track structure in the service in which the locomotive is employed, and also accurately measures the proportion of the expenses of the upkeep or maintenance of the roadbed and tracks to be assigned to such service.

In Equity. Suit by the Ann Arbor Railroad Company against Cassius L. Glasgow, Grant Fellows, and others, to enjoin enforcement of the Michigan two-cent passenger fare law and orders of the Michigan Railroad Commission fixing freight rates. On motion for temporary injunction and on final hearing. Injunction denied, and bill dismissed.

Alexander L. Smith, of Toledo, Ohio, for plaintiff.

Grant Fellows, Atty. Gen., and David H. Crowley and L. W. Carr, Asst. Attys. Gen., of Lansing, Mich., for defendants.

Before KNAPPEN and DENISON, Circuit Judges, and SESSIONS, District Judge, under section 266 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [Comp. St. 1913, § 1243]).

PER CURIAM. [1] This preliminary injunction is not sought to preserve an existing situation against a threatened change, but rather to modify a condition in which the railroad company has acquiesced for several years. No bond which can be required from plaintiff can be practically and completely efficacious to protect the traveling public, if an injunction should now issue and if plaintiff should finally fail. There is a presumption that the challenged act of the Michigan Legislature is constitutional. These considerations, peculiar to such a case as this, forbid the issue of the temporary writ, unless it is made reasonably clear that, upon the record as it stands, plaintiff is entitled to the relief sought.

If the final hearing were to be delayed one or two years, as counsel seem to think probable, we would have to pass definitely at this time upon the application as presented. In that event, we should require further development of the facts in some directions—as, for example, regarding the depreciation charge to operating expenses recommended by the Interstate Commerce Commission, but not actually made by plaintiff, and the propriety of employing the factor of speed in reaching the composite use unit adopted by plaintiff, as well as the accuracy of the speeds assumed; but, if a speedy final hearing can be had, these additional matters can be there developed to better advantage than by ex parte affidavits. We are satisfied that such final hearing can be had, and within a very brief time; and we therefore

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

shall not now either grant or deny the injunction, but shall hold the application open for the present, pending hearing of the principal case upon the merits, and without prejudice to further consideration or action, either on our own motion or on motion of either party, should circumstances later make it necessary.

The reason why it has been assumed that there must be a long delay seems to be that detailed expert adversary appraisals are thought to be necessary. We are not so impressed. The difference between the valuation claimed by plaintiff and the valuation fixed by the state for taxing purposes is not great enough to require such appraisals. From the evidence now available to both parties, it would seem that the court could fix an approximate valuation, and we cannot think that the issue whether or not there is confiscation could be controlled by the comparatively small difference which might develop between the result of detailed appraisal and the result obtainable by more general methods.

We all concur in the belief of the District Judge, who will be the trial judge, that, under the facts shown by the record and those of which the court takes judicial notice, neither party can be prejudiced by requiring prompt final hearing on the merits.

The clerk will notify both counsel of the filing of this memorandum.

## On the Merits.

Bill filed by the Ann Arbor Railroad Company to set aside the two-cent fare law of the state of Michigan and the orders of the Michigan Railroad Commission fixing the freight rates.

Joseph B. Cotton, of New York City, Chauncey Colton, of Duluth, Minn., and Alexander L. Smith, of Toledo, Ohio, for plaintiff.

Grant Fellows, Atty. Gen., and David H. Crowley and L. W. Carr, Asst. Attys. Gen., of Lansing, Mich., for defendants.

SESSIONS, District Judge. [2] The sole question to be determined in this case is whether, as applied to plaintiff's railroad, the Michigan two-cent passenger fare law and certain freight rates established by the Michigan Railroad Commission pursuant to statutory authority are confiscatory. This question is mainly one of fact. The properties of railroad companies and other public utility corporations are devoted to public use, and therefore are necessarily subject to public regulation within constitutional limitations. Such corporations are clothed with unusual powers, and owe a corresponding duty to exercise those powers fairly and reasonably and for the public good. Every charter or franchise granted to such a corporation contains a direct obligation to yield obedience to the lawful mandates of the sovereignty to which it owes its existence. Railroad property is so far public in its nature as to be subject at all times to reasonable legislative regulation, and, on the other hand, is so far private in character that its owners cannot be deprived of any part thereof without just compensation. On one side is the imperative duty to render required service at a reasonable rate, and upon the other side is the absolute right to

be permitted to earn a fair return upon the capital necessarily invested in the enterprise.

The power to control and regulate public utility corporations is vested in the legislative and not in the judicial branch of the government. Courts can neither make rates nor review and revise those made by competent authority. Unless the law-making body so far transgresses fundamental law as to commit a legislative theft, the courts may not interfere. With reference to permitted returns upon invested capital, the margin between full and complete adequacy and confiscation may be quite wide. Hence, in a doubtful case, a court may not substitute its judgment for that of the Legislature. Hence, also, the settled rule that, to warrant a decree declaring a rate statute invalid, the proof that such statute necessarily results in confiscation must be clear, satisfactory, and convincing.

[3] Precisely what is the just compensation without which the Federal Constitution forbids the taking of property for public use is seldom easy to determine. It cannot be measured by any yardstick of mathematical certainty. It must vary with the varying conditions and circumstances of each particular problem. Rates which, with efficient and economical management, yield a return equal to that received in other business ventures of similar character and attended with like risks, can never be adjudged to be confiscatory. But the rate-making power is not confined within such narrow limits. While the rate of interest established by law upon money investments, in the absence of express contract, may not measure correctly, or even with approximate accuracy, the return which, as a matter of business policy, railroad carriers should be permitted to earn upon the fair value of their properties employed in the public service, it may well be doubted that any court would be justified in setting aside and holding for naught a legislative enactment which permitted net earnings equal to or not materially less than the interest allowed by statute upon obligations containing no specific agreement in that regard. At any rate, the circumstances would have to be very unusual and the showing very convincing to persuade a court so to do.

[4] Here, as in most rate cases, the problem to be solved is one of values, revenues, and expenses, and the division or apportionment of such values, revenues, and expenses between the passenger and freight operations, and then between the interstate and the intrastate services of the railroad, and, finally, the finding of the net return upon its intrastate passenger and freight business. The revenues of the road have been ascertained and apportioned accurately, and in that regard there is no controversy. The real contest is concerning values and expenses, and their apportionment or division. One of the chief difficulties encountered is to assign correctly the expenses of the maintenance and operation of the property used in common in the various kinds of traffic. The passenger fare statute here attacked was enacted in 1907, and the orders of the Railroad Commission with reference to freight rates, of which complaint is made, were issued and became effective in 1914 and 1915. The period of time covered by the proofs is the two fiscal years ending June 30, 1915. The record in this case

consists for the most part of the annual reports of the Ann Arbor Company to its stockholders for the years 1907 to 1915, inclusive, numerous schedules or tables prepared at the suggestion and request of the court, and setting forth in minute detail the claims, theories, and computations of the respective parties, and a large volume of oral testimony in the main explanatory of the schedules or tables so presented.

## Values.

The first important factor in determining the net return which the railroad company is receiving is the value of the property upon which such return is to be computed. According to plaintiff's schedules, prepared by its chief engineer, the total present value (as of June 30, 1914) of its property in Michigan, exclusive of working assets, car ferries, and dock property, is $8,631,967, made up of these items: Fixed property of every kind, $5,100,872; rolling stock, $2,351,271; and "overheads," $1,179,824. According to the same schedules the total present value (as of June 30, 1915) of its Michigan property, exclusive of working assets, car ferries, and dock property, is $8,307,455, made up of these items: Fixed property, $4,925,657; rolling stock, $2,207,725; and "overheads," $1,174,073. According to other schedules prepared for plaintiff by an expert accountant, its working capital for the year 1914 was $306,688, and the value of that part of the station building in Toledo, Ohio, used for general administrative purposes, was $25,735, making a total value of all properties in Michigan, except car ferries and docks, for that year, $8,964,390. In 1915, according to the same expert, the corresponding figures were as follows: Working capital, $327,487; station building at Toledo, $25,092; and total value, $8,660,034.

[5] *Cost of Reproduction New Less Depreciation.*—Plaintiff has proceeded upon the theory that the cost of reproduction new less accumulated depreciation correctly represents the present value of its fixed property and rolling stock. This method of ascertaining values has received the approval of courts in a number of cases, and perhaps is the best general method yet devised. But it cannot be applied in all cases and under all conditions. In its use some important elements of value are ignored. Among other elements so partly or wholly ignored are density of population and traffic and obsolescence of equipment. It requires the same number of ties and tons of steel rails and it costs approximately the same amount of money to construct the roadbed and track of a railroad through a sparsely settled country furnishing little traffic as through a densely populated territory between large terminals yielding a large amount of business. The cost of reproducing the roadbed and track of an old railroad which has served its purpose and exhausted its traffic is nearly, if not quite, as large as the expense of rebuilding the same parts of a railroad the traffic and earnings of which are constantly increasing. The northwest one-third of plaintiff's line of road traverses a sparsely settled and little improved country, from which the timber, at one time its chief asset, has been removed, and which at present contributes to the railroad only a comparatively small amount of intrastate revenues. It is conceded that,

were it not for its translake interstate business, this division or part of the railroad could not live. Such conditions may call for higher rates, but they do not make for greater values. In the schedules here under consideration the roadbed and track in this division are given the same value, mile for mile, as the roadbed and track between Owosso and Toledo. It must be apparent that such a computation is erroneous both in theory and in fact.

Some of plaintiff's freight cars are old and out of date, and, because of their small size and capacity, cannot be used economically under present competitive conditions. Some of its passenger coaches are not modern. Its gasoline motor cars were constructed in 1911. Since then there have been many improvements in the design and structure of gasoline motors. The advance in railroad motor construction has been, to a lesser extent and degree, similar to that made in the automobile industry. An agent of the builder of these motor cars testified that cars of their type are not now being built. The theory of reproduction new less a flat percentage of annual depreciation does not sufficiently recognize the lessening of values of equipment by reason of its becoming obsolete. However, for the purpose of this case and for want of a better one, this method of determining values may be adopted, although it is not approved in its entirety.

*Right of Way and Station Grounds.*—The valuation placed upon the right of way and station grounds, exclusive of all improvements thereon, is $397,104, to which sum has been added more than 14 per cent. thereof for so-called "overheads." This basic valuation has been reached by applying to the right of way without improvements the estimated values of adjacent lands, including all buildings and other improvements. It is sufficient to say that this method of computing values and the practice of adding "overheads" to actual values are contrary to the letter and the spirit of the rule laid down by the Supreme Court in the Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. Numerous witnesses for the defendants have testified that the aggregate present value of the lands constituting plaintiff's right of way and station grounds is the sum of $246,615. Apparently these witnesses speak from actual knowledge, and their valuations are adopted as being more nearly correct.

*Fences.*—Plaintiff's valuation of the fences along its right of way at $125,440 is conceded to be erroneous, and defendants' figures ($54,-908) will be substituted therefor.

*Depreciation.*—Contrary to the schedules presented, and notwithstanding the testimony of the engineers, counsel for plaintiff, at the final arguments, earnestly insisted that no depreciation should be charged against the roadbed and track structure of the railroad. This contention cannot be sustained. The evidence shows that the life of ties is from 8 to 10 years, and of steel rails and track fastenings about 20 years. Ballast must be renewed, and bridges, trestles, and culverts decay and must be replaced. In short, each unit of the track structure is perishable, and, notwithstanding repairs, at some time reaches the end of its life. The engineers testify that a track structure as old as

that of the Ann Arbor Company in normal condition is 100 per cent. efficient, but only about 80 per cent. in value as measured by cost of reproduction new. The depreciation here allowed is in substantial conformity to such testimony.

*Appreciation.*—Counsel for plaintiff also insist, and the evidence indicates, that the roadbed of a railroad appreciates in value, at least during the first few years after construction. The grade becomes more compact and solid with age and use, and the slopes of the grade and the ditches become covered with vegetation, which tends to prevent erosion. However, no allowance is made for such appreciation in any of plaintiff's schedules or computations, and there is no evidence from which the value of such appreciation can be determined with any degree of certainty. It is true that one witness testified that a larger number of section men are required to keep in condition a new railroad than an old one. This may be owing to the fact that a new railroad is seldom in a normally perfect condition of completion at the beginning of its operation. At any rate, this testimony does not furnish a sound basis for the allowance of additional values.

*Overheads.*—Proceeding upon the theory that values are to be ascertained and fixed upon the basis of the actual rebuilding of the railroad, plaintiff has added overheads amounting to upwards of $1,000,000 and composed of the following items: $4\frac{1}{2}$ per cent. of the reproduction cost of its fixed properties, without depreciation for "survey and engineering expenses and superintendence during construction"; 4 per cent. of the reproduction cost (without depreciation) of its fixed properties and rolling stock, including engineering expenses, for "interest during construction (3 per cent.) and legal expenses and organization (1 per cent.)"; and, for "contingencies $7\frac{1}{2}$ per cent., depreciated to $5\frac{1}{2}$ per cent." on the total reproduction cost of its fixed and personal property. Possibly it may be permissible in a rate case like this one, where values are computed by the method of reproduction less depreciation, to add something for engineering expenses and interest during construction and for legal and organization expenses although the last item is more than doubtful. But the evidence in the present case furnishes no warrant or justification for an allowance for contingencies. Contingencies are said to be of two kinds: Those of inventory and those of construction. In these days of highly systematized work there is little chance of omissions in inventory, and, while in theory this railroad is to be reconstructed, in fact it is already built and in operation, and there can be no unknown contingencies of construction. Moreover, costs of construction which make up plaintiff's valuations have been fixed at top prices charged by contractors and builders, who assume all the risks of contingent losses. Ties are valued from 10 to 25 per cent. higher than the actual cost to this company. The cost of grading and track-laying is figured upon the basis of contract prices from 10 to 30 per cent. greater than those prevailing even in these days of high prices. In fact, each item or class of property has been valued sufficiently high to include a safe and sufficient margin for contingencies, and no sound reason exists for the allowance of an additional lump sum to cover improbable losses.

*Working Capital.*—The right of a railroad company to include in its property, upon which it is entitled to earn a fair return, a reasonable amount of working assets, such as cash, fuel, materials, and supplies, which it actually owns and has on hand, cannot be seriously questioned. In this instance plaintiff's expert accountant has fallen into a serious and obvious error in computing the amount of such working capital. In his computation he has found the average "excess of working liabilities over working assets," "*exclusive* of cash on hand and fuel, material, and supplies on hand," and has called such excess working capital. He has thus attempted to capitalize the debts of the company. From the annual reports of the company it appears that the cash on hand which is shown in the same table or schedule is not available for use in the operation of the railroad. Most of it consists of special deposits to meet interest and other obligations. It fairly appears, however, that the railroad company had material, fuel, and other supplies on hand in 1914 of the value of $149,570, and in 1915 of the value of $144,265.

*Car Ferries and Docks.*—Plaintiff claims that its car ferries and dock property are worth $761,346. Before the final hearing of this case plaintiff had discontinued its translake passenger business, and a very small percentage of its translake freight business is intrastate. Besides, the statute and orders here attacked do not affect or control in any way the rates or charges for lake transportation. Competitive conditions are solely responsible for the unremunerative charges for this service. It follows that, at least as to passenger rates, the value of the car ferries and dock property should not be considered.

*Summary.*—Condensed schedules or tables of the values of plaintiff's property in Michigan, revised and corrected as above stated, are as follows:

### 1914.

| | |
|---|---:|
| Right of way and station grounds | $  246,615 00 |
| Other fixed property | 4,633,236 00 |
| Engineering expenses during construction (4½ per cent. of $5,-446,638) | 245,098 00 |
| Rolling stock and equipment | 2,351,271 00 |
| Interest during construction and legal expenses and organization (4 per cent. of $9,083,115) | 363,325 00 |
| Working capital | 149,570 00 |
| Toledo Terminal used for general administrative purposes | 25,735 00 |
| **Total** | **$8,014,850 00** |

### 1915.

| | |
|---|---:|
| Right of way and station grounds | $  246,615 00 |
| Other fixed property | 4,457,144 00 |
| Engineering expenses during construction (4½ per cent. of $5,-488,766) | 246,995 00 |
| Rolling stock and equipment | 2,207,725 00 |
| Interest during construction and legal expenses and organization (4 per cent. of $9,002,631) | 360,105 00 |
| Working capital | 144,265 00 |
| Toledo Terminal used for general administrative purposes | 25,092 00 |
| **Total** | **$7,687,941 00** |

Assignment and Allocation of Property Values and Operating
Expenses.

In the apportionment and division of values and operating expenses of the railroad property in common service in all classes of traffic, the experts upon both sides of this controversy have advanced and employed many methods and theories, the greater number of which are new, untried, and hence unapproved. To discuss these theories separately and in detail would prolong this opinion beyond reasonable or proper limits. However, in the view taken, it is unnecessary to enter upon such a discussion. The right result and conclusion will be reached if, except as otherwise stated, the theories and methods of plaintiff's expert witnesses are accepted and employed. But it must be distinctly understood that the acceptance for convenience is not an approval of such theories.

[6] One of the theories so advanced merits at least a brief consideration, because it lies at the foundation of plaintiff's case, and therefore has been pressed with much insistence. In its division, as between passenger and freight services, of the right of way, roadbed, and track structure, and of the operating expenses incident to such property, plaintiff has employed what is known as the "locomotive ton mile ratio" or factor. This ratio is an essential part of the so-called "Oklahoma theory," which, after the decision of the Supreme Court in the Minnesota Rate Cases, some of the railroads in the Southwest evolved in an attempt to meet the requirements of that decision. An allocation made in accordance with the locomotive ton mile ratio proceeds upon the assumed basis that the ton weight of a locomotive, without its tender, multiplied by the number of miles traveled, correctly represents the measure of the use of the roadbed and track structure in the service in which the locomotive is employed, and also accurately measures the proportion of the expenses of the upkeep or maintenance of the roadbed and track to be assigned to such service. So far as known this ratio has not been adopted by any court. In Boyle v. St. Louis & S. F. R. R. Co. (D. C.) 222 Fed. 539, it was urged, but not employed, because, in that case, it was found unnecessary to make a division of either property or expenses. It is difficult to perceive how either the use or the expense of maintenance of such property can be measured even approximately with a factor which wholly ignores the train and the load behind the engine. It is true that the locomotive is a unit of property common to both services. But there the analogy ceases. It seems obvious that a locomotive pulling a short passenger train weighing about 200 tons does not make the same use of the track and roadbed as it does when hauling a long train of loaded freight cars weighing upwards of 1,000 tons, whether such use is reckoned by traffic carried, results accomplished, time consumed, or wear and tear. No sound reason has been given for claiming that an engine with a short and light load of empty cars makes the same use of the track as does the same engine with a long train of heavily loaded freight cars. It is said that the speed of the train is an important element, and that this theory recognizes the higher speed of the passenger train. Except in the very limited sense of charging more property and more expense to the passenger

service, the locomotive ton mile theory does not recognize or take into account the element of speed, any more than do those theories which are based partly or wholly upon the' weight and mileage of the entire train. The relation between increased speed and increased use is not shown. Limited or fast trains are not run upon the Ann Arbor Railroad, and the evidence shows that the difference in wear upon the track caused by differences in the speeds of slow trains is neither measurable nor appreciable. This theory may be a step in advance of old theories which have been rejected and discarded, but it does not meet all the requirements of a case like the present one.

Through the courtesy of the parties to this suit, the computations, the results of which are herein stated, have been made and carefully verified by two expert accountants, Mr. Piper, of the Ann Arbor Company, and Mr. Parker, of the Attorney General's office, working together, and hence are accurate and correct.

*Allocation to Passenger and Freight Services.*—Applying plaintiff's theories and ratios to the corrected values above stated, the resultant assignment of property values to the passenger and freight services, respectively, is as follows:

| 1914. | Passenger. | Freight. | Total. |
|---|---|---|---|
| Fixed property | $1,663,526 00 | $3,216,325 00 | $4,879,851 00 |
| Engineering expenses | 83,554 00 | 161.544 00 | 245,098 00 |
| Rolling stock | 366,198 00 | 1,985,073 00 | 2,351,271 00 |
| Interest, legal expenses, etc. | 102,701 00 | 260,624 00 | 363,325 00 |
| Working capital | 42,279 00 | 107,291 00 | 149,570 00 |
| Toledo Terminal | 7,275 00 | 18,460 00 | 25,735 00 |
| Totals | $2,265,533 00 | $5,749,317 00 | $8,014,850 00 |

Supplemental to the above, plaintiff has added to the passenger values and subtracted from the freight values the sum of $79,360 as a so-called fuel adjustment. In other words, it is a charge and credit for freight property employed in the carriage of fuel and other materials used in the passenger service. Such adjustment is incomplete and incorrect, in that no allowance is made for the carriage upon passenger trains of materials used and persons employed in the freight service. This item would amount to a considerable sum and might offset the charge so made. However, again adopting, but not approving, the charge and credit so made, and adding such amount to the passenger side and subtracting it from the freight side of the account, the final figures are: Passenger, $2,344,893; and freight, $5,669,957.

| 1915. | Passenger. | Freight. | Total. |
|---|---|---|---|
| Fixed property | $1,634,519 00 | $3,069,240 00 | $4,703,759 00 |
| Engineering expenses | 85,828 00 | 161,167 00 | 246,995 00 |
| Rolling stock | 402,251 00 | 1,805,474 00 | 2,207,725 00 |
| Interest, legal expenses, etc. | 106,778 00 | 253,327 00 | 360,105 00 |
| Working capital | 42,777 00 | 101,488 00 | 144,265 00 |
| Toledo Terminal | 7,440 00 | 17,652 00 | 25,092 00 |
| Totals | $2,279,593 00 | $5,408,348 00 | $7,687,941 00 |
| Fuel adjustment | +67,776 00 | —67,776 00 | |
| Final totals | $2,347,369 00 | $5,340,572 00 | $7,687,941 00 |

*Expenses.*—Depreciation, over and above mere repairs, is constantly taking place in the perishable units of railroad property, and, for rate-making purposes, the owner is entitled to include in operating expenses such a sum of money as will make good this depreciation. In this instance, plaintiff's chief engineer has estimated the annual depreciation of its fixed property at upwards of $235,000, and at first this amount was added to operating expenses. Later it was conceded that this sum should be reduced to $108,175.42. The reduction in the value of fences further reduces the amount so claimed to about $96,000. The evidence shows conclusively that plaintiff is not entitled to make any charge for annual depreciation of fixed property, for the reason that such depreciation has already been taken care of by moneys expended and charged upon the company's books to operating expenses. The annual reports of the company show that the moneys expended in grading, in the purchase of new ties and rails, in the construction of new and better bridges, trestles, and culverts, and of new fences, in building and rebuilding station houses and other structures, and upon the fixed property in general, have been sufficient to restore current depreciation and to keep the property up to an unusually high standard of efficiency and condition. The general manager of another railroad, who made a trip of inspection over this railroad for the purpose of qualifying himself to testify in this case, expressed great surprise at the almost perfect conditions which he found. The vice president and general manager of the Ann Arbor Company testifies that there is little or no deferred maintenance in the roadway, track, and structures, and that the property is as well maintained as traffic conditions warrant. There is no showing as to what part, if any, of the little deferred maintenance which exists has arisen and occurred during the years 1914 and 1915 here under consideration. With this charge for annual depreciation of fixed property omitted, the account of expenses, revenues, and returns in Michigan stands as follows:

| 1914. | Passenger. | Freight. | Total. |
|---|---|---|---|
| Revenues (actual) | $646,324 26 | $1,401,753 84 | $2,048,078 10 |
| Operating expenses | 510,245 73 | 1,239,285 97 | 1,749,531 70 |
| Net income | $136,078 53 | $162,467 87 | $298,546 40 |
| Value of property | 2,344,893 00 | 5,669,957 00 | 8,014,850 00 |
| Rate of return | 5.803% | 2.865% | 3.724% |
| 1915. | Passenger. | Freight. | Total. |
| Revenues (actual) | $632,891 57 | $1,644,696 37 | $2,277,587 94 |
| Operating expenses | 507,101 05 | 1,415,292 00 | 1,922,393 05 |
| Net income | $125,790 52 | $229,404 37 | $355,194 89 |
| Value of property | 2,347,369 00 | 5,340,572 00 | 7,687,941 00 |
| Rate of return | 5.359% | 4.296% | 4.620% |

*Auxiliary Service.*—Plaintiff carries mail, express, and milk on its passenger cars and trains. During 10 or 12 weeks in the summer season it gives sleeping car and parlor car service and an increased dining car service. These outside services require additional expenditures and yield separate revenues. Hence a further division of passenger revenues, expenses, and property values becomes necessary. The

schedules showing this division, prepared by plaintiff's expert accountant, are so incomplete, inaccurate, and misleading as to be of little value. In making these schedules the accountant has erroneously assumed that the maximum month of August is representative of the entire year. He has charged all of the expenses of operating the sleeping, dining, parlor, and official cars to the passenger service, and as a crowning inconsistency has credited all of the revenues derived from those cars and from station and train privileges and telegraph receipts to special or outside service. His ratio of division is claimed to be the relative ton mile use of car floor space devoted to the passenger and baggage and outside services respectively. Sleepers, diners, and chair cars are much heavier than the ordinary day coach. The expert accountant says that, to obtain a correct ratio, the weight of the heavier cars should be divided, and the part thereof equal to the weight of a day coach should be charged to the passenger and baggage service, and the excess weight to special service. In making his computations he has so charged the passenger service, but he has failed to charge the excess weight to the special service. He has also charged to the passenger service all of the box baggage cars, although three-quarters of the space in those cars was devoted to the carriage of milk and express. By such erroneous computations he obtains for the year 1914 a divisional ratio of 84.19 per cent. for passenger and baggage, and 15.81 per cent. for milk, express, and mail service, and for the year 1915 a like ratio of 84.55 per cent. and 15.45 per cent. The least that can be done is to correct such palpable and inexcusable mathematical errors. If the excess weight of diners, sleepers, and chair cars is placed in the column of auxiliary service, where it belongs upon the accountant's own theory, and no other change is made in this schedule, the resultant ratio for the year 1914 will be 79.55 per cent. for passenger and baggage, and 20.45 per cent. for auxiliary service; and for 1915, 80.97 per cent. for passenger and baggage and 19.03 per cent. for auxiliary service. By a similar computation, which at least has the merit of being mathematically correct, and which covers the operations of the entire year 1914, one of the expert accountants for the defendants obtains a ratio of 77.73 per cent. for passenger and baggage, and 22.27 per cent. for auxiliary service. Another of the numerous errors in these schedules consists of crediting first to the passenger and then to the auxiliary service all of the telegraph receipts, amounting in 1914 to $1,962.24 and in 1915 to $2,172.34. Of these amounts there should be credited to the freight service in 1914 the sum of $860.25, and in 1915 the sum of $922.14. After adjusting the item of telegraph receipts and applying the corrected ratios to plaintiff's schedules and to the corrected values and expenses hereinabove stated, the accounts stand as follows:

| 1914. | Passenger and Baggage. | Auxiliary. |
| --- | --- | --- |
| Revenues | $528,203 69 | $113,944 86 |
| Expenses | 405,900 48 | 109,431 65 |
| Net income | $122,303 21 | $4,513 21 |
| Value of property | 1,865,362 00 | 479,531 00 |
| Rate of return | 6.557% | 0.941% |

| 1915. | Passenger and Baggage. | Auxiliary. |
|---|---|---|
| Revenues | $523,508 78 | $103,281 65 |
| Expenses | 402,201 68 | 99,071 07 |
| Net income | $121,307 10 | $4,210 58 |
| Value of property | 1,900,665 00 | 446,704 00 |
| Rate of return | 6.382% | 0.943% |

If the ratios of plaintiff's accountant (84.19% :15.81% in 1914, and 84.55% :15.45% in 1915) be applied to the corrected values and expenses and the receipts be properly credited, the resultant rates of return will be 5.380 per cent. from passenger and baggage and 5.559 per cent. from auxiliary service in 1914, and 5.563 per cent. from passenger and baggage and 4.164 per cent. from auxiliary service in 1915. Plaintiff insists that, under its contract with the government, it is carrying mail at a considerable loss, and that its milk traffic is not profitable, unless considered and treated as a mere transportation by-product. Hence, it may be fairly assumed that the lesser rate of return from outside services is more nearly correct than the greater one.

*Intrastate and Interstate.*—The contention that the cost per mile of the transportation of an intrastate passenger is greater than that of an interstate passenger is probably sound. But here, in one respect at least, the claim is pressed too far. Plaintiff's accountant first divides the expenses of passenger and baggage service into terminal and line haul. The further and final division of terminal property values and expenses is based upon the assumption that each intrastate passenger uses the Michigan station privileges twice, once in entraining and once in detraining, and that each interstate passenger, other than interline, uses such privileges but once. Hence, to obtain the number of terminal use units assigned to intrastate and interstate services respectively, the whole number of intrastate passengers is multiplied by two, the number of interline interstate passengers is also multiplied by two, and the number of interstate passengers, other than interline, is multiplied by one. The record shows that, upon the Ann Arbor Railroad, the average journey of the interstate passenger is more than 2½ times longer than that of the intrastate passenger. It thus appears that, by the method of computation here employed, the terminal property values and expenses per passenger mile apportioned to the intrastate service are approximately five times in amount those apportioned to the interstate service. The record also shows that, in each year, about 250,000 intrastate passengers pay cash fares upon the train, and hence make little or no use of the station privileges, and further that quite a number of so-called stations are mere platforms or sheds, without agents or other attendants. But, again applying plaintiff's theories, and recasting the figures to conform to the necessary changes in values and expenses, the final schedules are as follows:

Passenger.

| 1914. | Interstate. | Intrastate. | Total. |
|---|---|---|---|
| Revenues (actual) | $137,592 86 | $390,610 83 | $528,203 69 |
| Expenses | 101,876 38 | 304,024 10 | 405,900 48 |
| Net income | $35,716 48 | $86,586 73 | $122,303 21 |
| Value of property | 502,374 00 | 1,362,988 00 | 1,865,362 00 |
| Rate of return | 7.110% | 6.353% | 6.557% |

### Passenger.

| 1915. | Interstate. | Intrastate. | Total. |
|---|---|---|---|
| Revenues (actual) | $127,709 51 | $395,799 27 | $523,508 78 |
| Expenses | 87,274 92 | 314,926 76 | 402,201 68 |
| Net income | $40,434 59 | $80,872 51 | $121,307 10 |
| Value of property | 440.653 00 | 1,460,012 00 | 1,900.665 00 |
| Rate of return | 9.176% | 5.539% | 6.382% |

### Freight.

| 1914. | Interstate. | Intrastate. | Total. |
|---|---|---|---|
| Revenues (actual) | $1,091,002 70 | $310,751 14 | $1,401,753 84 |
| Expenses | 985,544 39 | 253,741 58 | 1,239,285 97 |
| Net income | $105,458 31 | $57,009 56 | $162,467 87 |
| Value of property | $4,893,455 00 | $776,502 00 | $5,669,957 00 |
| Boat property (erroneously stated) | 517,994 00 | 110,259 00 | 628,253 00 |
| Total values | $5,411,449 00 | $886,761 00 | $6,298,210 00 |
| Rate of return | 1.948% | 6.428% | 2.579% |

| 1915. | Interstate. | Intrastate. | Total. |
|---|---|---|---|
| Revenues (actual) | $1,287,567 00 | $357,129 37 | $1,644,696 37 |
| Expenses | 1,149,914 26 | 265,377 74 | 1,415,292 00 |
| Net income | $137,652 74 | $91,751 63 | $229,404 37 |
| Value of property, including boats, $741,018 00 | 5,305,084 24 | 776,505 76 | 6,081,590 00 |
| Rate of return | 2.595% | 11.816% | 3.772% |

To even summarize in this opinion the many computations which have been made since the hearing of this case would only add to the unfortunate confusion and perplexities already existing. The results herein stated are those most favorable to plaintiff. The work sheets of all computations will be preserved, and will be available at any time to the parties or their counsel.

The evidence shows that much more than one-half of plaintiff's revenues are derived from the transportation of interstate freight, and that a large part of such freight is low grade and produces but little more income than expenses. It is apparent that the inadequacy of return, of which complaint is made, results from this traffic, rather than from the intrastate business of the railroad. Untried and imperfect theories, which conflict with actual conditions, are unsafe guides, and furnish no warrant for judicial nullification of legislative enactments. Plaintiff has failed in its attempt to prove that the intrastate rates fixed by the Michigan statute and by the orders of the state Railroad Commission are confiscatory.

A decree will be entered, dismissing the bill of complaint, with costs to the defendants to be taxed.